BART F. VIRDEN, Judge
Appellant Linda Kantor appeals from the Union County Circuit Court's order appointing her ex-husband, David Kantor, guardian of their disabled adult daughter, Rebecca (DOB: 4-4-1997). Linda argues that (1) the circuit court lost jurisdiction over the case when, pursuant to *750 Ark. Code Ann. § 9-27-306(a)(1)(B) (Repl. 2015), there was no request for the circuit court to continue jurisdiction and no determination was made whether Rebecca was engaged in a course of treatment, both of which had to occur before Rebecca's eighteenth birthday and (2) the circuit court erred by appointing David guardian of Rebecca because the Arkansas Department of Human Services (DHS), which filed the petition on David's behalf, did not have party status and failed to present sufficient proof to satisfy the statutory requirements of Ark. Code Ann. §§ 28-65-211 and 28-65-203 (Repl. 2012 & Supp. 2017). We reverse and remand.
I. Procedural History
This case began as a dependency-neglect proceeding in December 2014. DHS filed a petition for emergency custody and dependency-neglect based on allegations of maltreatment toward then seventeen-year-old Rebecca, who was described as "severely mentally handicapped." DHS's investigation revealed that Rebecca had not been attending school because she and Linda had been passing the flu back and forth to each other; that Linda had not taken Rebecca to see a doctor; that Linda acknowledged that Rebecca had been sitting in urine since the previous day but that Linda said she had been too sick to change her; that Linda was uncertain whether she could care for Rebecca and had said at some point that Rebecca would be better off in DHS's custody; and that Linda denied wanting to commit suicide but said that she had been diagnosed with depression. Linda was asked to submit to a drug screen, but she refused. DHS then contacted David, who resides in Texas, but David said that he could not take Rebecca at that time because he needed time to find a facility for her because he works and cares for his and Linda's younger daughter. DHS took a seventy-two-hour hold on Rebecca on December 16, 2014. In the affidavit, the social worker recounted DHS's history with the family. There were seventeen allegations of abuse or neglect on twelve occasions between July 2002 and June 2014. Five of the allegations, including abuse (cuts/welts/bruises), medical neglect, and environmental neglect, were found true.
The circuit court entered an ex parte order for emergency custody on December 22, 2014, and later found probable cause to believe that Rebecca was dependent-neglected, that the emergency conditions that necessitated Rebecca's removal from Linda's custody continued to exist, and that Rebecca should remain in DHS's custody. On March 19, 2015, the circuit court adjudicated Rebecca dependent-neglected and specifically found that Linda was not in a position to care for Rebecca's special needs. The goal was reunification. The circuit court entered review orders in June and September 2015, each time finding that it was in Rebecca's best interest to remain in DHS's custody. A permanency-planning order was entered on January 12, 2016, in which the circuit court found the following:
The Court, mindful of the available permanency planning dispositions, in accordance with the best interest, health, and safety of the juvenile ... does hereby determine the goal of the case shall be Another Planned Permanent Living Arrangement (APPLA). The Department shall develop a plan that addresses the quality of services, including, but not limited to, independent living services, if age appropriate, and a plan for the supervision and nurturing the juvenile shall receive. The Court selects this goal because the Department documented a compelling reason, specifically Rebecca is 18-years old and requires full time care that her parents cannot provide[.]
*751 [I]t would not be in the best interest of the juvenile to follow one of the permanency plans listed in A.C.A. 9-27-338(c)(1)-(6).
Additional review orders were entered, all of which continued the goal of APPLA.
On September 22, 2017, DHS petitioned for the appointment of David as guardian of Rebecca. DHS alleged that Rebecca is incapacitated by reason of mental disability and further alleged that
Rebecca Kantor communicates mostly through hand gestures, is incontinent, has unsteady ambulation-requires constant monitoring to prevent falls, has Cerebral Palsy, needs assistance with all daily living requirements, understands 70% of simple clear directions, to such extent the alleged incapacitated person lacks sufficient understanding or capacity to make or communicate decisions to meet the essential requirements for the alleged incapacitated person's health or safety.
On September 26, 2017, Linda filed a petition to appoint herself as Rebecca's guardian. Linda agreed that Rebecca is incapacitated, and her allegations supporting that conclusion mirrored those of DHS. Further, Linda alleged that David had never taken care of Rebecca's physical or medical needs in the past and that she has provided all of Rebecca's healthcare throughout her life until DHS took custody of Rebecca.
II. Testimony-October 16, 2017
DHS introduced several exhibits at the beginning of the hearing. A DHS report indicated that Rebecca had entered foster care on December 16, 2014, through Arkansas Support Network (ASN), and in August 2016, she had been moved to an apartment with full-time supervision. A "Personal Care Service Plan" from ASN states that Rebecca has cerebral palsy ; that she is currently living independently in her home with 24/7 staff; that she attends a day-treatment program through ASN Monday through Friday; that she communicates mostly through gestures but can say "no" and "bye"; that she is incontinent of bowel and bladder; that she understands seventy percent of simple, clear directions; and that she needs assistance with all activities of daily living (ADLs). The document lists Rebecca's disabling conditions and functional abilities and then sets forth a personal-care plan with respect to eating, bathing, and dressing ; personal hygiene; bowel and bladder requirements; taking medication; laundry and incidental housekeeping; shopping for personal items; and mobility and ambulation. The "consumer goal" is to "continue to assist and provide services r/t ADLs for Rebecca so that she will be able to live as independently in the community as possible without risk of institutionalization." A second similar document was introduced by DHS called "Personal Care Assessment and Service Plan," which is signed by a physician stating, "I have examined this patient within the past 60 days. I have reviewed the assessment and I confirm its accuracy. I authorize the personal care assistance detailed in this service plan...."
David Kantor testified that he and Linda were married "two years max." He stated that he lives in Plano, Texas, and has no intention of moving because his ninety-two-year-old father is in an assisted-living facility there. He said that his home is about a six-hour drive from Rebecca's placement in Fayetteville. David admitted that he had not visited Rebecca since she had been at ASN because of the long distance but said that he was working on getting Rebecca moved to Texas. He said that he wanted Linda's visits with Rebecca to be supervised because he had *752 caught Linda smoking marijuana with their younger, then sixteen-year-old daughter, H.K.; however, he insisted that he would never prevent Linda from seeing Rebecca. David testified that Rebecca has cerebral palsy but that "[the doctors] don't really have a syndrome for her." He said that he is aware that she has trouble walking, has an eating disorder, and is mentally retarded. He acknowledged that Rebecca can never live by herself. David conceded that Linda had taken care of Rebecca's doctors' appointments and treatments in the past and had kept him apprised of her situation. He said that Linda had changed after they split up and that "as time wore on it got to be too much for her to take care of Rebecca." With respect to DHS's history with the family, David said that Linda was the offender thirteen times and that he had been involved with reporting alleged maltreatment on two of those occasions.
Linda Kantor testified that Rebecca is incapacitated by reason of mental disability and that in 2003 a geneticist at Arkansas Children's Hospital had diagnosed Rebecca with an "unidentified unknown syndrome with cerebral palsy like symptoms." Linda said that Rebecca is "clerical but non-verbal" and that she had been learning sign language. She agreed that Rebecca cannot do anything for herself. When she was asked who had provided most of the hands-on care for Rebecca since birth, Linda said,
We decided together that one of us needed to stop working to take care of R.K. because she required 24/7 care. Even though I made more money, it was decided that I would be the one to give up my career to care for R.K. and I've done so ever since. I've done everything for her. I've taken her to all of her doctor appointments. When we were together, I've been the one doing everything. Setting up the appointments with the specialists, the therapists, gathering information that needed to be done, dealing with the school. I've done all of that.
Linda further testified that she believed ASN was the best place right now for Rebecca. She said that she should be appointed Rebecca's guardian because she is "experienced with her disabilities and her special needs." She said that David was "never really involved with her care" and that "he was never really interested." Linda testified that she has been diagnosed with depression, anxiety, and posttraumatic stress disorder, that she could pass a drug screen that day, that she sees a therapist twice a month, and that she did not know of any warrants for her arrest from the State of Texas but later said that she had been charged with driving without insurance and had not been able to pay the fine. Linda said that she did not own a vehicle but that she had access to two vehicles. She conceded having canceled visits with Rebecca twice in August 2017 and twice in September 2017 due to lack of transportation, but she insisted that both vehicles had mechanical problems and that one was "still dead." Linda admitted that she had had no contact with Rebecca for two years and that she had been living in Springdale for four months before she started visiting Rebecca in Fayetteville in June 2017.
III. Circuit Court's Order
On December 18, 2017, the circuit court entered an order appointing David guardian of Rebecca's person. The circuit court found that Rebecca is in need of a guardian and that David is suitable and capable to act as her guardian. The circuit court limited David's power in stating that Rebecca cannot be moved from her current placement without court approval, waived the requirement of bond "inasmuch as petitioner *753 is seeking a guardianship of the person only," denied Linda's petition, and noted that Linda's visitation with Rebecca would continue to be supervised.
IV. Discussion
A. Jurisdiction
Arkansas Code Annotated section 9-27-306 provides the following:
(a)(1) The circuit court shall have exclusive original jurisdiction of and shall be the sole court for the following proceedings governed by this subchapter, including without limitation ... (B) Proceedings in which a juvenile is alleged to be dependent or dependent-neglected from birth to eighteen (18) years of age, except for the following:
(i)(a) A juvenile who has been adjudicated dependent or dependent-neglected before eighteen (18) years of age may request the court to continue jurisdiction over the juvenile until twenty-one (21) years of age so long as the juvenile is engaged in a course of instruction or treatment, or is working at least eighty (80) hours a month toward gaining self-sufficiency.
(b) The court shall retain jurisdiction only if the juvenile remains or has a viable plan to remain in instruction or treatment, or is working at least eighty (80) hours a month toward gaining self-sufficiency.
(c) The court shall discontinue jurisdiction only after a hearing to determine whether:
(1) The juvenile knowingly and voluntarily is requesting to leave care or the juvenile has failed to be engaged in or have a viable plan to participate in a course of instruction or treatment or is not working at least eighty (80) hours per month toward gaining self-sufficiency; and
(2) The Department of Human Services has fully complied with §§ 9-27-363 and 9-28-114; or
(ii) A juvenile may contact his or her attorney ad litem to petition the court to return to the court's jurisdiction to receive independent living or transitional services if the juvenile:
(a) Was adjudicated dependent or dependent-neglected;
(b) Was in foster care at eighteen (18) years of age;
(c) Left foster care but desires to submit to the jurisdiction of the court before reaching twenty-one (21) years of age to benefit from independent living or transitional services; or
(d) Left foster care and decides to submit to the jurisdiction of the court and return to foster care to receive transitional services[.]
....
(2) A juvenile shall not under any circumstance remain under the court's jurisdiction past twenty-one years of age.
Citing Ark. Code Ann. § 9-27-306(a)(1)(B)(i), Linda argues for the first time on appeal that the circuit court lost jurisdiction to hold hearings and enter orders in this matter after Rebecca turned eighteen because-before her eighteenth birthday-Rebecca had not requested that the circuit court retain jurisdiction of the matter and because there had been no finding that she was engaged in a qualifying treatment plan. Linda further relies on Z.L. v. State , 2015 Ark. 484, 478 S.W.3d 207, in which the Arkansas Supreme Court interpreted section 9-27-306(a)(2) set forth above to mean that the circuit court's jurisdiction ceases on the juvenile's twenty-first birthday and held that the circuit *754 court lacked jurisdiction to impose an adult sentence after Z.L. had turned twenty-one.
We do not address Linda's interpretation of section 9-27-306(a)(1)(B)(i) because Linda's argument does not involve subject-matter jurisdiction. Also, Z.L. is distinguishable in that it is a delinquency case involving section 9-27-306(a)(1)(A)(i) & (ii). More importantly, the case is distinguishable by the fact that Z.L. argued below that the circuit court had lost jurisdiction after he turned twenty-one.
Although Linda characterizes her argument on appeal as one involving subject-matter jurisdiction, which can be raised for the first time on appeal, we do not agree. Jurisdiction of the subject matter is power lawfully conferred on a court to adjudge matters concerning the general question in controversy. Banning v. State , 22 Ark. App. 144, 737 S.W.2d 167 (1987). It is power to act on the general cause of action alleged and to determine whether the particular facts call for the exercise of that power. Id. Subject-matter jurisdiction does not depend on a correct exercise of that power in any particular case. Id. If the court errs in its decision or proceeds irregularly within its assigned jurisdiction, the remedy is by appeal or direct action in the erring court. Id. If it was within the court's jurisdiction to act upon the subject matter, that action is binding until reversed or set aside. Id.
Amendment 80 to the Arkansas Constitution provides that circuit courts are established as the trial courts of original jurisdiction of all justiciable matters not otherwise assigned pursuant to the Constitution. Ark. Const. amend. 80, § 6 (A). The Arkansas Supreme Court issued Administrative Order Number 14, which provides that the circuit judges of a judicial circuit shall establish the following subject-matter divisions in each county of the judicial circuit: criminal, civil, juvenile, probate, and domestic relations. It further provides that the designation of divisions is for the purpose of judicial administration and caseload management and is not for the purpose of subject-matter jurisdiction. Ark. Sup. Ct. Admin. Order No. 14(1)(a). It also provides that, although guardianship proceedings are generally "probate" cases, the definition of "probate" is not intended to restrict the juvenile division of circuit court from hearing a guardianship matter that arises in juvenile proceedings. Ark. Sup. Ct. Admin. Order No. 14(1)(b).
Here, the circuit court had subject-matter jurisdiction to hear the guardianship proceeding, which arose out of dependency-neglect proceedings. While the circuit court may have erred in retaining jurisdiction in the absence of a formal request that it do so, a failure to follow statutory procedure does not oust the subject-matter jurisdiction of the court. Noble v. Norris , 368 Ark. 69, 243 S.W.3d 260 (2006) ; cf. Picinich v. Ark. Dep't of Human Servs. , 2018 Ark. App. 288, 549 S.W.3d 916 (holding that the circuit court did not lose subject-matter jurisdiction when it failed to follow mandated statutory time frames for entry of adjudication order). The statute, Ark. Code Ann. § 9-27-306(a)(1)(B)(i)(a) , contemplates that the circuit court's juvenile division may exercise jurisdiction over a juvenile up to twenty-one years of age. Because Linda did not object to what was an irregularity in the proceedings below, her argument is not preserved. See, e.g. , D.C.T. v. State , 2012 Ark. App. 227, 2012 WL 1111393 (holding that the circuit court did not lack subject-matter jurisdiction when it ordered appellant to register as a sex offender even though such order is permitted by Ark. Code Ann. § 9-27-356(b)(2) only if it is recommended by the person conducting the sex-offender risk assessment).
*755 B. Guardianship
1. Standing and party status
As a preliminary matter, DHS argues that Linda lacks standing to challenge the appointment of David as Rebecca's guardian because Linda was not a party to the proceedings given that Rebecca is an adult. DHS also says that, because Linda was not entitled to notice under Ark. Code Ann. §§ 28-65-207(b)(2), 28-1-110, and 28-1-112 (Repl. 2012), she was not an interested party. We disagree.
The question of standing is a matter of law for this court to decide, and the appellate courts review questions of law de novo. Hinton v. Bethany Christian Servs. , 2015 Ark. App. 301, 462 S.W.3d 361. Linda may not have been entitled to notice, but she was served with DHS's petition, she filed a counterpetition for guardianship, she attended the hearing, and the circuit court disposed of both petitions in the same order on appeal. See Cogburn v. Wolfenbarger , 85 Ark. App. 206, 148 S.W.3d 787 (2004) (rejecting appellee's argument that appellant lacked standing because appellant had been given notice of the hearing, filed an answer to the petition, and appeared at the hearings). Because Linda was aggrieved by the order on appeal, which denied her petition for guardianship, she has standing.
Linda has a related argument. She contends that DHS had no authority to be a party to any action related to Rebecca or to file a guardianship petition on David's behalf. She relies on Young v. Arkansas Department of Human Services , 2012 Ark. 334, 2012 WL 4163177, which she says stands for the proposition that DHS is no longer a necessary party when the dependency-neglect action is no longer active. Young is distinguishable. Young began as a dependency-neglect action, but once the circuit court granted a permanent guardianship of S.S. to the Sextons, S.S. was no longer a dependent-neglected juvenile. The dependency-neglect proceedings were thus dismissed, and the case was closed. Later, the Sextons filed a motion to stop all visitation between Young and S.S. The circuit court "purported to reopen" the closed dependency-neglect case under the Juvenile Code. The supreme court held that the circuit court erred in applying the Juvenile Code because the case could not be reopened. Here, the case was not reopened-in fact, it had never been closed, and Rebecca remained in DHS's custody. Any person may file a petition for the appointment of himself or herself or some other qualified person as guardian of an incapacitated person. Ark. Code Ann. § 28-65-205(a). Rebecca was in DHS's custody pursuant to a court order, and DHS filed a petition to appoint David as guardian. Linda makes no persuasive argument that DHS was not a proper party to petition for guardianship.
We hold that Linda has standing to challenge the order on appeal and that DHS was a proper party to file a guardianship petition on David's behalf; thus, we move on to Linda's arguments.
Before appointing a guardian, the court must be satisfied that (1) the person for whom a guardian is prayed is either a minor or otherwise incapacitated, (2) a guardianship is desirable to protect the interests of the incapacitated person, and (3) the person to be appointed guardian is qualified and suitable to act as such. Ark. Code Ann. § 28-65-210. Linda challenges the first and third elements. Guardianship proceedings are reviewed de novo, but the appellate courts will not reverse a guardianship decision unless it is clearly erroneous, taking into consideration the circuit court's superior position to weigh and assess the credibility of the witnesses and *756 their testimony. Blunt v. Cartwright , 342 Ark. 662, 30 S.W.3d 737 (2000).
2. Proof of incapacitation
"Incapacitated person" means a person who is impaired by reason of a disability such as mental illness, mental deficiency, physical illness, chronic use of drugs, or chronic intoxication, to the extent of lacking sufficient understanding or capacity to make or communicate decisions to meet the essential requirements for his or her health or safety or to manage his or her estate. Ark. Code Ann. § 28-65-101(5)(A). "Incapacitated person" includes an endangered adult or impaired adult who is in the custody of DHS. Ark. Code Ann. § 28-65-101(5)(B) (Supp. 2017).
Arkansas Code Annotated section 28-65-211(b)(1) (Repl. 2012) states that, in determining the incapacity of a person for whom a guardian is sought to be appointed for cause other than minority, disappearance, or detention, or confinement by a foreign power, the court shall require that the evidence of incapacity include the oral testimony or sworn written statement of one or more qualified professionals, whose qualifications shall be set forth in their testimony or written statements. Also, a professional evaluation shall be performed prior to the court hearing on any petition for guardianship except when appointment is being made because of minority, disappearance, detention, or confinement by a foreign power. Ark. Code Ann. § 28-65-212(a)(1). The evaluation shall be performed by a professional or professionals with expertise appropriate for the respondent's alleged incapacity. Ark. Code Ann. § 28-65-212(a)(2). The evaluation shall include the following: (1) the respondent's medical and physical condition; (2) his or her adaptive behavior; (3) his or her intellectual functioning; and (4) a recommendation as to the specific areas for which assistance is needed and the least restrictive alternatives available. Ark. Code Ann. § 28-65-212(b).
Linda argues that the service plan introduced by DHS was not truly an evaluation; it was not a sworn written statement; and the doctor's qualifications were not set out in the service plan. We agree that, even assuming that the service plan qualifies as an evaluation, it was not a sworn written statement that set forth the physician's qualifications.
In Autry v. Beckham , 2014 Ark. App. 692, 450 S.W.3d 247, Autry petitioned for guardianship of her grandmother, Louise Whaley. The Beckhams, Whaley's neighbors, intervened and requested that they be appointed her guardians. Although the Beckhams moved for an evaluation of Whaley and their motion was granted, no evaluation was performed. Instead, an attorney ad litem met with Whaley and said that she felt that Whaley was incapacitated. Both parties thought that this was sufficient and that to require more would lead to an absurdity, but this court reversed and held that, without the required professional evaluation, the circuit court did not have sufficient evidence to find that a guardian needed to be appointed for Whaley.
In Cogburn , supra , Wolfenbarger filed a petition to be appointed her mother's guardian, and Cogburn, a son, asked that the petition be denied. The mother testified that she did not want a guardian. Both parties introduced letters from doctors with opposing viewpoints on the mother's incapacitation. The circuit court granted Wolfenbarger's petition. Cogburn appealed, arguing, among other things, that there was no compliance with section 28-65-212 because there was no oral testimony or sworn written statement from a qualified professional. This court agreed with Cogburn and held that the circuit *757 court clearly erred because there was no oral testimony or sworn statements and because the evaluations did not contain the four findings that are required; specifically, there was no finding as to the mother's adaptive behavior.
Here, the extensive documentation regarding Rebecca found in the service plan arguably qualifies as an evaluation. We agree with Linda, however, that the service plan is not a sworn written statement and does not set out the doctor's qualifications. DHS contends that the doctor's authorization serves as a promise that the information contained in the service plan is accurate and that the "M.D." following the doctor's name complies with "the spirit" of the statute. However, we are not convinced that the latter suffices under the statute given that section 28-65-212(a)(2) requires that the evaluation be performed by a professional with expertise appropriate for the respondent's alleged incapacity. Moreover, a doctor's authorization for treatment is not a sworn written statement. Alternatively, DHS argues that Linda invited any error given that she alleged in her petition for guardianship that Rebecca was incapacitated. We do not agree that the invited-error doctrine should be applied here.
In Rogers v. Ritchie , 2017 Ark. App. 420, 528 S.W.3d 272, there was a dispute about estate expenditures between Rogers, as guardian of her husband and his estate, and Ritchie, as personal representative of the estate, by virtue of a judgment against Rogers's husband's accounting firm. Barbara moved to terminate the guardianship, but the circuit court refused. On appeal, Barbara argued, among other things, that the circuit court erred in refusing to find that her appointment as guardian was void on its face because the order was entered without the requisite evidence of her husband's incapacity from a qualified professional. This court held that Barbara could not make this argument because she had invited the error: it was Barbara who had requested the guardianship and failed to obtain the requisite professional evaluation, and she at one time defended the validity of the guardianship when others, including Ritchie, moved to set it aside.
Linda was perhaps complicit in this error, but the facts here are not as strong as those in Rogers . Linda was not the first one to file a petition for guardianship, and she had not been appointed guardian such that she could have ever defended its validity. We will not apply the invited-error doctrine under this set of facts. Because we hold that the circuit court clearly erred in finding that DHS proved Rebecca's incapacitation as required by the statute, we do not address Linda's argument that David was not qualified in that he had not appointed a resident agent for service of process and had not submitted a bond and that the circuit court must have found David unsuitable on some level because it had limited his ability to move Rebecca from ASN.
We reverse and remand with directions that this guardianship matter be transferred to the probate division of the circuit court for further action consistent with this decision.[1]
Reversed and remanded.
Gruber, C.J., agrees.
Whiteaker, J., concurs.
*758 I agree with the majority that this case should be reversed and remanded. I agree that there was insufficient evidence presented to satisfy the statutory requirements under Arkansas Code Annotated sections 28-65-211 and 29-65-203 (Supp. 2017). I also agree with the majority that the circuit court had subject-matter jurisdiction to hear the guardianship proceeding, which arose out of the dependency-neglect proceeding. Ark. Dep't of Human Servs. v. Collier , 351 Ark. 506, 95 S.W.3d 772 (2003). I write separately, however, because, with all due respect to the circuit court, I believe that the circuit court erred and exceeded its statutory authority when it acted beyond Rebecca's eighteenth birthday. I acknowledge that this error was an irregularity in the proceeding below and agree that Linda's arguments are not preserved because she did not object below. Because this error is capable of repetition, however, I feel that a separate opinion is necessary to address it.
I begin with an analysis of pertinent provisions of the Juvenile Code. Arkansas Code Annotated section 9-27-306 (Repl. 2015) provides in pertinent part:
(a)(1) The circuit court shall have exclusive original jurisdiction of and shall be the sole court for the following proceedings governed by this subchapter, including without limitation:
....
(B) Proceedings in which a juvenile is alleged to be dependent or dependent-neglected from birth to eighteen (18) years of age, except for the following:
(i)(a) A juvenile who has been adjudicated dependent or dependent-neglected before eighteen (18) years of age may request the court to continue jurisdiction over the juvenile until twenty-one (21) years of age so long as the juvenile is engaged in a course of instruction or treatment, or is working at least eighty (80) hours a month toward gaining self-sufficiency.
(b) The court shall retain jurisdiction only if the juvenile remains or has a viable plan to remain in instruction or treatment, or is working at least eighty (80) hours a month toward gaining self-sufficiency.
(c) The court shall discontinue jurisdiction only after a hearing to determine whether:
(1) The juvenile knowingly and voluntarily is requesting to leave care or the juvenile has failed to be engaged in or have a viable plan to participate in a course of instruction or treatment or is not working at least eighty (80) hours per month toward gaining self-sufficiency; and
(2) The Department of Human Services has fully complied with §§ 9-27-363 and 9-28-114; or
(ii) A juvenile may contact his or her attorney ad litem to petition the court to return to the court's jurisdiction to receive independent living or transitional services if the juvenile:
(a) Was adjudicated dependent or dependent-neglected;
(b) Was in foster care at eighteen (18) years of age;
(c) Left foster care but desires to submit to the jurisdiction of the court before reaching twenty-one (21) years of age to benefit from independent living or transitional services; or
(d) Left foster care and decides to submit to the jurisdiction of the court and return to foster care to receive transitional services.
....
(2) A juvenile shall not under any circumstance remain under the court's *759 jurisdiction past twenty-one (21) years of age.
Ark. Code Ann. § 9-27-306 (Repl. 2015).
A juvenile is defined as an individual who is "[f]rom birth to age eighteen (18) years, whether married or single[.]" Ark. Code Ann. § 9-27-303(32)(A) (Supp. 2017). Our supreme court has held that the language of section 9-27-303(32)(A) is "plain and unambiguous, and it clearly defines 'juvenile' as an individual from 'birth to eighteen.' " Collier, supra.
Taking these two provisions together, I find section 9-27-306 to be plain, unambiguous, and clear; therefore, by statute, the juvenile court has "exclusive jurisdiction" in dependency-neglect proceedings only until the juvenile reaches the age of eighteen. Ark. Code Ann. § 9-27-306(a)(1)(B). Once the juvenile turns eighteen, the juvenile court loses its authority and can retain authority over a juvenile past his or her eighteenth birthday only if one of two exceptions apply.
First, the court can continue to exercise its authority up to the juvenile's twenty-first birthday if, prior to the juvenile's eighteenth birthday, the juvenile requests the court retain jurisdiction and if the juvenile is engaged in a course of instruction or treatment or is working at least eighty (80) hours a month toward gaining self-sufficiency. Ark. Code Ann. § 9-27-306(a)(1)(B)(i). Here, there is nothing to reflect that Rebecca requested the court to retain jurisdiction, and this first exception does not apply.
Second, the juvenile court can reassert jurisdiction once the juvenile has reached the age of majority under limited statutory authority. A juvenile between the ages of eighteen and twenty-one who had previously been under the jurisdiction of the court can ask the court through his or her ad litem to reinvest jurisdiction. Ark. Code Ann. § 9-27-306(a)(1)(B)(ii). Again, there is nothing to reflect that Rebecca or her ad litem asked the court to reinvest jurisdiction, and this exception does not apply. Accordingly, under the clear, unambiguous terms of the statute, the juvenile court erred and exceeded its statutory authority to act once Rebecca reached the age of eighteen.

Section 9-27-306(a)(2) states that a juvenile shall not under any circumstances remain under the juvenile division's jurisdiction past twenty-one years of age. Rebecca turned twenty-one in April of this year.